IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Molly Moore, | Civil Action No. 2:25-v-6348-RMG-MGB |
| Plaintiff, | |
| vs. | |
| Summit Materials, LLC d/b/a Quikrete Holdings, Inc.; Quikrete Holdings, Inc.; Argos USA, LLC; and Concrete Supply Co., LLC, | **COMPLAINT** <br> **Jury Trial Requested** |
| Defendants. | |

Plaintiff Molly Moore ("Moore"), files this Complaint against Defendants Summit Materials, LLC d/b/a Quikrete Holdings, Inc. ("Summit"); Quikrete Holdings, Inc. ("Quikrete"); Argos USA, LLC ("Argos"); and Concrete Supply Co., LLC ("CSC") [collectively "Defendants"] and alleges as follows:

**PARTIES**

1. Plaintiff is a resident of Charleston County, South Carolina.

2. Upon information and belief, during the relevant period at issue in this matter, Summit operated as a cement and aggregate production and distribution company incorporated in Delaware and maintaining offices and agents and otherwise doing business in this District directly and through its parents, subsidiaries, predecessors/successors in interest, and related entities, including Argos and Quikrete.

3. Upon information and belief, during the relevant period at issue in this matter, Argos operated as a cement and aggregate production and distribution company incorporated in Delaware and maintaining offices and agents and otherwise doing business in this District

directly and through its parents, subsidiaries, predecessors/successors in interest, and related entities, including Summit, Quikrete, and CSC.

4.      Upon information and belief, Quikrete operates as a cement and aggregate production and distribution company incorporated in Delaware and maintaining offices and agents and otherwise doing business in this District directly and through its parents, subsidiaries, predecessors/successors in interest, and related entities, including Summit and Argos.

5.      Upon information and belief, CSC operates as a cement and aggregate production and distribution company organized under the laws of North Carolina and maintaining offices and agents and otherwise doing business in this District directly and through its parents, subsidiaries, predecessors/successors in interest, and related entities, including Summit and Argos.

6.      Upon information and belief, in or around late 2023/early 2024, Summit and Argos merged with one another with Summit acquiring Argos and continuing operations in the State of South Carolina. Prior to and after the merger, the company/companies continued providing the same services to the same customers with the same employee base, including Plaintiff and her supervisory personnel.

7.      Following the merger, Summit/Argos continued holding itself out as both Summit and Argos, sometimes interchangeably with one name or the other being used independently and sometimes with both names being used in conjunction, including on corporate letterhead, email signature blocks, email domain addresses, and in company personnel/legal correspondence and documents.

8.      Upon information and belief, on November 25, 2024, Summit and Quikrete announced their intention to merge with one another with Quikrete acquiring all of Summit Materials.

9. Upon information and belief, in or around early February 2025, Quikrete and Summit closed on the acquisition for approximately $11.5B, including debt, and Summit became a privately held subsidiary of Quikrete. Summit stopped its business operations and its common stock ceased trading on the NYSE on February 10, 2025. Quikrete now owns 100% of the stock of Summit.

10. Quikrete, along with its various subsidiaries, continues the same operations as Summit/Argos with the same customer and employee base in the State of South Carolina.

11. In February 2025 and at the time of the merger closing between Quikrete and Summit, Plaintiff Moore's EEOC charges had been pending with the federal agency since September 2024 and Summit had already submitted its Position Statement to the agency through counsel. Furthermore, Plaintiff's counsel sent a preservation of evidence letter to Summit/Argos' Chief Legal Counsel, Chris Gaskill, on October 10, 2024, highlighting the underlying claims. The terms of the merger required due diligence and disclosure of all pending employment related proceedings, including Plaintiff's claims. Thus, Quikrete had both actual and constructive knowledge of Plaintiff's claims at the time of the merger.

12. Upon information and belief, Argos currently operates as a subsidiary of Quikrete, doing business as Quikrete Construction Materials, LLC.

13. Upon information and belief, in or around February 2025, CSC acquired various concrete ready-mix assets of Argos located in the Carolinas, including in the Charleston market, and continues operations in the State of South Carolina. The acquisition included both physical assets/plants along with various employee resources.

14. CSC continues the same operations as Argos with the same customer and employee base in the State of South Carolina. Some of the same management that participated in the underlying facts relating to Plaintiff remained at the company following the acquisition.

15. In February 2025 and at the time of the acquisition by CSC, Plaintiff Moore's EEOC charges had been pending with the federal agency since September 2024 and Argos had already submitted its Position Statement to the agency through counsel. Furthermore, Plaintiff's counsel sent a preservation of evidence letter to Summit/Argos' Chief Legal Counsel, Chris Gaskill, on October 10, 2024, highlighting the underlying claims. Thus, CSC had both actual and constructive knowledge of Plaintiff's claims at the time of the acquisition.

16. Upon information and belief, it is not assured that Argos or Summit has the ability to provide relief to Plaintiff in this matter, particularly in light of the fact that both entities have ceased all business operations and now operate only by and through their successor and related entities.

17. Defendants Quikrete and CSC are liable in this matter under the principles of successor liability.

## JURISDICTION & VENUE

18. This action arises under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (FMLA) and the Pregnancy Discrimination Act, 42 U.S.C. §§2000e, *et seq.* (PDA).

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as they arise under the FMLA and the PDA/Title VII.

20. This Court has personal jurisdiction over Defendants and venue is proper because Defendants are entities that regularly and routinely conduct and/or conducted business in this

District during the relevant period and as the acts and/or omissions giving rise to the causes of action occurred in this District.

## FACTS

21. On or around January 6, 2023, Mrs. Moore began working for Defendant Argos as a Sales Representative in Charleston.

22. During Mrs. Moore's employment, she was a good and valuable employee who at all times met or exceeded her employer's reasonable expectations for job performance and conduct and otherwise maintained an excellent employment record. She received various bonuses and raises throughout her employment.

23. In late 2023, Mrs. Moore became pregnant.

24. Mrs. Moore informed her direct supervisor, Curtis Sutton (Division Sales Manager), of her pregnancy in mid-November 2023. Mr. Sutton, in turn, informed upper-level corporate management that Mrs. Moore was pregnant by no later than December 13, 2023.

25. Shortly thereafter, in January 2024, Sutton and Henry "Whit" Suber (Operations Manager) hosted a professional recruitment dinner for an individual involved in the Charleston area concrete industry named Chris Westbury. The purpose of Sutton and Suber's professional dinner was to recruit and hire Mr. Westbury as another Sales Representative in the Charleston area.

26. Previously, Mrs. Moore had been the only Sales Representative working in the Charleston area.

27. On or about February 21, 2024, Argos/Summit sent out an internal company-wide email to all employees, including both Plaintiff and Sutton, with the subject line "ARGOS-SUMMIT IS HIRING, Sales Representative, Charleston, SC, February 21, 2024."

28. Upon receipt of this email, Mrs. Moore was shocked and concerned that the job advertisement was for her own position, particularly due to the fact that she had just informed management of her pregnancy and need for future maternity leave and accommodations.

29. Almost immediately after receipt of the email, Mrs. Moore called Sutton to express her concerns. Presumably because he had also received the same company-wide email, recruited Westbury himself for the hire, and was expecting Mrs. Moore's phone call in light of the recent email, Sutton answered the call by stating "You're not fired, don't worry!"

30. Mrs. Moore expressed her concerns on the call that the job announcement and subsequent hiring was due to her pregnancy and a desire to hire a replacement for her. Sutton responded to Mrs. Moore's concerns by assuring her that the company was only hiring someone to help handle her job duties while she was out on maternity leave, but not with the intention of replacing her upon her return.

31. On or about February 26, 2024, Mr. Westbury started working in his new role as a "Sales Representative" in the Charleston office.

32. Mrs. Moore was tasked with training Mr. Westbury on her exact job duties and, in his position, Mr. Westbury reported to the Charleston office with Mrs. Moore.

33. In late April 2024, Mrs. Moore began experiencing some medical complications with her pregnancy.

34. On May 1, 2024, Mrs. Moore's physician recommended that she work remotely from home for the remainder of her pregnancy because she was considered "high risk."

35. Mrs. Moore presented her doctor's reasonable accommodation request to Mr. Sutton on the following day, May 2, 2024.

36. Mr. Sutton stated that he would have to discuss her accommodation request with Melissa Swanson (General Manager for the Carolinas) and dissuaded Mrs. Moore from requesting an accommodation to work remotely, stating "You know how Melissa is. You have to be very cautious with her."

37. Because Defendants never responded to Mrs. Moore's request for a reasonable accommodation, she was left with no choice other than to continue going in to work and visit customer job sites until shortly before her child was born, even though her doctor had recommended remote work for the duration of the remaining pregnancy and even though she could have fulfilled her job duties remotely without creating an undue burden.

38. Mrs. Moore gave birth to her child on June 19, 2024.

39. Following childbirth, Mrs. Moore was placed on maternity leave.

40. Starting in mid-July 2024, Mr. Sutton began contacting Mrs. Moore to inquire about her anticipated return to work date. For example, on July 15, 2024, Sutton texted Moore stating "What is your return-to-work date?" Again, only two days later, on July 17, 2024, Sutton texted again stating "Hey Molly, hope you're doing well! What is your projected date for starting back at work?"

41. As Mrs. Moore had been advised that she had some accrued paid time off (PTO) pursuant to Defendants' policy and that her short term disability payments would decrease after six weeks, she responded to Sutton's multiple inquiries about when she would be back at work and inquired with him as to how many remaining PTO days she had available to use and whether these PTO days could be used during her maternity leave following the reduction of her short term disability benefit payments.

42. During these communications, Mrs. Moore advised Sutton that she wanted to use her remaining PTO days during her ongoing maternity leave and asked for his help in submitting and approving such a request as she did not have access to the portal containing such information and as she did not understand the process.

43. On July 19, 2024, Sutton notified Mrs. Moore that Lamar Young (Human Resources Representative) and Melissa Swanson had confirmed that she had six days of PTO remaining that could be used during her maternity leave, but that she could only use the PTO days if she returned to "active" status first to initiate them by coming into the office in person before going back out on maternity leave.

44. Mr. Sutton texted Mrs. Moore a screenshot of an email he had received from Young stating that she had "six days of PTO remaining for the year" and could use them during her maternity leave, but that she "would need to be returned to an active status" before she could go back out on maternity leave and use the six PTO days.

45. Mrs. Moore sought clarification from Mr. Young as to the company's requirement that she be returned to active status for the sole purpose of being allowed to use her remaining accrued PTO days, even though she was not able to and did not actually intend to return to work at that point in time, and sought information as to the process and paperwork that would be needed.

46. However, despite Mrs. Moore's attempts to obtain clarification on the stated requirements, Mr. Young did not provide any assistance in this regard and simply continued to state that Mrs. Moore would only be allowed to use her remaining PTO days if she returned to active status and obtained a certification to this effect, even though the whole purpose in using the remaining PTO days would be for Mrs. Moore to continue her maternity leave.

47. Mrs. Moore also continued seeking clarification on the process from Sutton, notified him that she did not understand why she had to return to active status simply to continue her maternity leave and use her remaining PTO, and asked for his help in allowing her to use her PTO during her maternity leave on numerous occasions.

48. Based upon the information provided by the company and the company's stated requirement that she be returned to "active" status in order to use her remaining PTO days during the remainder of her maternity leave (even though she did not actually intend on returning to work at that point in time and needed to continue her maternity leave), Mrs. Moore provided an ADA accommodation request form to her physician to complete in order to temporarily return her to "active" status in order to use her PTO during her leave.

49. Mrs. Moore's physician completed the paperwork the company had requested based upon the instructions that the company management had provided to Mrs. Moore for using her PTO during the remainder of her maternity leave and clearly stated that she could not return to work without the listed reasonable accommodations being provided, including no commuting or in-person work.

50. While Mr. Sutton provided no assistance in clarifying the confusion, he continued to demand that Mrs. Moore advise him of her firm return-to-work date and that she provide her doctor's note clearing her to be placed on active status.

51. On August 12, 2024, Sutton texted Mrs. Moore to again demand a return date and note, which Plaintiff did the following day. After receipt, Sutton instructed Mrs. Moore to return to the office on the morning of August 14 in person.

52.    Based on Sutton's instruction and management's assurances that she had six days of remaining PTO leave still available, but that she could only use it if she was returned to "active" status with the company, Mrs. Moore returned to the office on the morning of August 14, 2024.

53.    Mrs. Moore's intention in going in to the office and returning to "active" status was to go directly back out on maternity leave that same morning and immediately use her remaining six days of PTO, as she had previously discussed with management many times.

54.    However, when Mrs. Moore returned to the office per management's instructions, Mr. Sutton and Mr. Young met with her and informed her that she did *not* have six days of PTO as they had previously advised her, but that she actually only had *one* day of PTO remaining. This was despite the written and verbal assurances they had previously provided her and even despite the fact that Mrs. Moore's official work leave balance in the company's time and attendance system still showed her as having six days of PTO available at that very time.

55.    Mrs. Moore explained, as she had many times in the past, that she was **not** ready to return to work that soon and would need more than **one** additional day of maternity leave before returning.

56.    Mr. Young responded by stating that now that Mrs. Moore had been returned to "active" status, she could not be returned to "inactive" status to use the remainder of her FMLA or any other kind of maternity leave. Rather, Mr. Young informed Mrs. Moore that the only remaining leave that she could take was the single day of PTO and then she would be required to return to work again as normal with no accommodations as there were no other maternity leave options available to her due to the fact that he had just placed her back on "active" status.

57.    Mrs. Moore still had weeks of available FMLA leave remaining at the time.

58. Accordingly, because Mr. Young would not permit Mrs. Moore to use her remaining FMLA leave, after taking the single day of PTO she was informed she had remaining, she was forced to return back to the office again even though she was not actually ready to return to work from her maternity leave, which the company was well aware of.

59. Upon her return to work on August 19, 2024, Mrs. Moore was called into the conference room where Mr. Sutton and Mr. Young were again waiting on her.

60. Mr. Sutton and Mr. Young informed Mrs. Moore that she was being terminated effective immediately because of an alleged ongoing reorganization project. No performance deficiencies whatsoever were mentioned during the termination conference, and, to the contrary, Young informed her that it was "not a Molly Moore thing" and that her termination had nothing to do with her work performance.

61. She was also presented with a written termination letter signed by "Melissa Swanson, General Manager" which echoed Sutton and Young's statements that the termination was due to an alleged "ongoing reorganization." No performance deficiencies were noted in the termination letter.

62. Mr. Westbury, the male employee who had been hired immediately after Mrs. Moore informed the company of her pregnancy and who Mrs. Moore had trained on her exact job duties, was not terminated as part of the purported reorganization project and was, instead, kept on in Mrs. Moore's prior role. He assumed all of Mrs. Moore's prior duties following her termination.

63. Despite the company's alleged reorganization, Mrs. Moore was the *only* "Sales Representative" in the entire company who was terminated at that time.

## FIRST CAUSE OF ACTION AS TO ALL DEFENDANTS
### (FMLA Interference & Denial of Substantive FMLA Rights; 29 U.S.C. §2615(a)(1))

64. Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein into this cause of action.

65. Mrs. Moore was an "eligible employee," as that term is defined in 29 USC § 2611(2)(A). She was employed by Defendants for at least 12 months, and had worked at least 1,250 hours during the 12-month period preceding her request for leave.

66. Defendants were a "covered employer," as that term is defined in 29 USC § 2611(4)(A)(I). Defendants were engaged in commerce, and they employed 50 or more employees within a 75-mile radius of the work site for each working day during each of 20 or more calendar workweeks in the current or preceding year.

67. Mrs. Moore had a qualifying reason for protected leave as defined by the FMLA, and as a result, she was entitled to a total of twelve (12) work weeks of unpaid leave for the purpose of her pregnancy and maternity leave. Additionally, Moore was entitled to be reinstated to the position she held prior to taking FMLA leave or a substantially equivalent position upon her return to work from FMLA leave.

68. Mrs. Moore gave Defendants adequate notice of the fact that she needed to take FMLA-protected leave due to her pregnancy.

69. Mrs. Moore exercised her rights under the FMLA by taking medical leave that was FMLA-qualifying and by requesting to use additional leave that was FMLA-qualifying.

70. Defendants were aware that Mrs. Moore needed to take leave for an FMLA-qualifying reason (i.e., her pregnancy, childbirth, and bonding).

71. Mrs. Moore was not timely notified of her eligibility to take FMLA leave, in violation of 29 CFR § 825.300(b)(1) (requiring that such notification be provided within five business days after an employee requests FMLA leave).

72. Defendants also failed to provide Mrs. Moore with a written notice detailing the specific expectations and obligations of the employee while on leave, as required by 29 CFR § 825.300(c)(1). Specifically, Defendants failed to notify Mrs. Moore of:

   a. the applicable 12-month period for her FMLA entitlement, as required by 29 CFR 825.300(c)(1)(1);

   b. her right to substitute paid leave, as required by 29 CFR 825.300(c)(1)(iii);

   c. whether she would be required to substitute paid leave, as required by 29 CFR 825.300(c)(1)(iii);

   d. what conditions, if any, applied to the substitution of paid leave, as required by 29 CFR 825.300(c)(1)(iii);

   e. her entitlement to take unpaid FMLA leave if she did not meet the conditions for substituting paid leave, as required by 29 CFR 825.300(c)(1)(iii);

   f. the consequences of her failure to make premium payments to maintain health benefits (i.e., the circumstances under which coverage may lapse), as required by 29 CFR 825.300(c)(1)(iv);

   g. her right to maintenance of benefits during her FMLA leave, as required by 29 CFR 825.300(c)(1)(vi);

   h. her right to be restored to the same or an equivalent position upon her return from FMLA leave, as required by 29 CFR 825.300(c)(1)(vi); and

   i. her potential liability for payment of health insurance premiums paid by the employer during her unpaid FMLA leave if she failed to return to work after taking FMLA leave, as required by 29 CFR 825.300(c)(1)(vii).

73. In fact, in regard to 29 CFR 825.300(c)(1)(iii), Defendants not only failed to inform Mrs. Moore of her right to substitute paid leave or of her right to take unpaid FMLA leave if she did

not meet the conditions for substituting paid leave, but they went so far as to provide her with false and misleading information relating to her use of both paid and unpaid leave.

74. Defendants also failed to provide Mrs. Moore with a written designation notice within five business days after receiving information sufficient to determine whether the leave was being taken for a FMLA-qualifying reason, as required by 29 CFR § 825.300(d).

75. Defendants further violated the FMLA by interfering with Mrs. Moore's FMLA rights by, among other acts:

   a. providing false and misleading information to Mrs. Moore in an effort to place her back into "active" status during her maternity leave;

   b. providing false and misleading information to Mrs. Moore relating to her ability to use the remainder of her FMLA leave;

   c. refusing to allow Mrs. Moore to use FMLA leave that was available to her for FMLA-qualifying reasons;

   d. attaching negative consequences to Mrs. Moore's use of leave that was protected by the FMLA;

   e. terminating Mrs. Moore for exercising her rights under the FMLA by taking FMLA-protected leave; and

   f. refusing to restore Mrs. Moore to her prior position.

76. Despite the explicit requirement in 29 CFR 825.300(c)(5) that employers responsively answer employee questions concerning their rights and responsibilities under the FMLA, no one responded to Mrs. Moore's questions. Instead, Defendants provided false and misleading information in response to her questions.

77. Defendants actively and continuously refused to provide Mrs. Moore with clear or accurate information, or to answer her questions regarding her rights and obligations under the FMLA.

78. As a result of Defendants' actions as set forth above, Mrs. Moore has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, expenses associated with the loss of medical insurance coverage, attorney's fees and costs, and prejudgment interest.

79. Defendants' violation of the FMLA was willful or in reckless disregard of Mrs. Moore's statutory rights. The violation was not in good faith, and Defendants had no reasonable grounds to believe that they were not violating the FMLA.

### SECOND CAUSE OF ACTION AS TO ALL DEFENDANTS
(FMLA Retaliation; 29 U.S.C. § 2615(a)(2))

80. Plaintiff incorporates all of the preceding paragraphs as if fully set forth herein into this cause of action.

81. Mrs. Moore was an "eligible employee," as that term is defined in 29 USC § 2611(2)(A). She was employed by Defendants for at least 12 months, and had worked at least 1,250 hours during the 12-month period preceding her request for leave.

82. Defendants were a "covered employer," as that term is defined in 29 USC § 2611(4)(A)(I). Defendants were engaged in commerce, and they employed 50 or more employees within a 75-mile radius of the work site for each working day during each of 20 or more calendar workweeks in the current or preceding year.

83. Mrs. Moore had a qualifying reason for medical leave as defined by the FMLA, and as a result, Mrs. Moore was entitled to a total of twelve (12) work weeks of unpaid leave for the purpose of her pregnancy and maternity leave. Additionally, Moore was entitled to be reinstated to the position she held prior to taking FMLA leave or a substantially equivalent position upon her return to work from FMLA leave.

84. Mrs. Moore gave Defendants adequate notice of the fact that she needed to take FMLA-qualifying protected leave, and the reason why she needed to take FMLA-qualifying protected leave.

85. Mrs. Moore requested and took protected leave due to her pregnancy and childbirth.

86. Defendants interfered with Mrs. Moore's FMLA rights by terminating her in retaliation for her exercise or attempted exercise of FMLA-protected rights.

87. Defendants stated reasons for Mrs. Moore's termination were false and pretextual.

88. Defendant had no legitimate business reasons for any of its actions, which constitute retaliation in violation of the FMLA.

89. As a result of Defendants' actions as set forth above, Mrs. Moore has suffered damages in the form of lost back and future wages, income and benefits, expenses associated with finding other work, expenses associated with the loss of medical insurance coverage, attorney's fees and costs, and prejudgment interest.

90. Defendants' violation of the FMLA was willful or in reckless disregard of Mrs. Moore's statutory rights. The violation was not in good faith, and Defendants had no reasonable grounds to believe that they were not violating the FMLA.

**THIRD CAUSE OF ACTION AS TO ALL DEFENDANTS**
**(Discrimination on the Basis of Pregnancy/Gender under Title VII/PDA and Failure to Accommodate under the PDA)**

91. Plaintiff incorporates all allegations above into this cause of action.

92. Defendants engaged in a pattern and practice of unlawful discrimination on the basis of pregnancy by, among other acts, refusing to provide a reasonable accommodation for Mrs. Moore, refusing to engage in the interactive process, providing false and misleading information to Mrs. Moore relating to her use of maternity leave and in relation to potential reasonable

accommodations, hiring a replacement for Mrs. Moore immediately upon finding out about her pregnancy and then subsequently terminating her following her pregnancy based upon false and pretextual reasons, thereby discriminating against her in violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII") and the Pregnancy Discrimination Act ("PDA").

93.     Defendants at all times relevant hereto had actual and constructive knowledge of the conduct described herein.

94.     Defendants failed to take all reasonable steps to prevent the discrimination based on pregnancy from occurring.

95.     Defendants violated Title VII and the PDA by failing to adequately supervise, control, or discipline and/or otherwise penalize the conduct, acts, and failures to act of Defendants as described herein.

96.     Within three hundred (300) days of Defendant's discrimination set forth above, on September 10, 2024, Mrs. Moore initiated the process of filing charges on the basis of pregnancy discrimination in employment with the EEOC, Charge No. 415-2024-02261 and Charge No. 415-2024-02262. Thereafter, the EEOC issued Right to Sue notices dated April 2, 2025, authorizing this lawsuit. Mrs. Moore has exhausted her administrative remedies.

97.     As a direct and proximate result of Defendants' violations of Title VII and the PDA, Mrs. Moore has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; and she has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mrs. Moore is thereby entitled to general and compensatory damages in amounts to be proven at trial.

98.     As a further direct and proximate result of Defendants' violation of Title VII and the PDA, Mrs. Moore has been compelled to retain the services of counsel in an effort to enforce the

terms and conditions of the employment relationship with Defendants and has thereby incurred, and will continue to incur, legal fees and costs. Mrs. Moore requests that attorney's fees be awarded.

99. Defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for Mrs. Moore's rights protected by federal law and, therefore, Mrs. Moore is entitled to recover punitive damages.

<b><u>FOURTH CAUSE OF ACTION OF ACTION AS TO ALL DEFENDANTS</u></b><br>
(Retaliation under Title VII/PDA)

100. Plaintiff incorporates all allegations above into this cause of action.

101. As herein alleged, Mrs. Moore engaged in protected activity by complaining to Sutton that she reasonably perceived the recruitment and hiring of Chris Westbury as being motivated by her then recently announced pregnancy and forthcoming need for maternity leave.

102. As herein alleged, Mrs. Moore also engaged in protected activity by notifying Defendants that she required reasonable accommodations for her pregnancy/childbirth in the form of, among other options, remote work and time off from work.

103. As herein alleged, Defendants illegally retaliated against Mrs. Moore by denying her reasonable accommodation requests, providing her false information relating to her requests and maternity leave, and terminating her employment for false and pretextual reasons.

104. Defendants had no legitimate business reasons for any of their actions, which constitute retaliation in violation of Title VII and the PDA.

105. Mrs. Moore is informed and believes, and based thereon alleges, that in addition to the practices enumerated above, Defendants may have engaged in other retaliatory practices against her which are not yet fully known. At such time as such retaliatory practices become known, Mrs. Moore will seek leave of Court to amend this Complaint in that regard.

106. Within three hundred (300) days of Defendant's discrimination set forth above, on September 10, 2024, Mrs. Moore initiated the process of filing charges on the basis of pregnancy discrimination and retaliation in employment with the EEOC, Charge No. 415-2024-02261 and Charge No. 415-2024-02262. Thereafter, the EEOC issued Right to Sue notices dated April 2, 2025, authorizing this lawsuit. Mrs. Moore has exhausted her administrative remedies.

107. As a direct and proximate result of Defendants' willful, knowing and intentional discrimination and retaliation against her, Mrs. Moore has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress. Plaintiff has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mrs. Moore is thereby entitled to general and compensatory damages in amounts to be proven at trial.

108. As a further, direct and proximate result of Defendants' violation of Title VII and the PDA as heretofore described, Mrs. Moore has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of her employment relationship with Defendants, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to her. Mrs. Moore requests that attorney's fees and costs be awarded pursuant to Title VII and the PDA.

109. Defendants' actions as set forth above were undertaken intentionally, willfully, wantonly, recklessly, maliciously, and with utter disregard for Mrs. Moore's rights protected by federal law and, therefore, Plaintiff is entitled to recover punitive damages.

WHEREFORE, Plaintiff requests that judgment be entered against Defendants, jointly and severally, on all causes of action and that she be awarded actual damages, compensatory damages, punitive damages, liquidated damages, all back and future wage damages associated

with the loss of Plaintiff's job, loss of retirement and other benefits, expenses associated with finding other work, expenses associated with the loss of medical insurance coverage, prejudgment interest, reasonable attorney's fees and costs of this action, and for such other and further relief as the Court deems just and proper.

                FALLS LEGAL, LLC

                _s/ J. Scott Falls_____
                J. Scott Falls
                Federal ID No. 10300
                Scott@falls-legal.com
                Ashley L. Falls
                Federal ID No. 12083
                Ashley@falls-legal.com
                125-E Wappoo Creek Dr., Suite 102
                Charleston, South Carolina 29412
                Telephone: (843) 737-6040
                Facsimile: (843) 737-6140

                Attorneys for Plaintiff Molly Moore

Charleston, South Carolina
June 27, 2025